NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1006-12T4

APPROVED FOR PUBLICATION

January 7, 2015

APPELLATE DIVISION

IN THE MATTER OF COMMISSION
PROCEEDING ON REVOCATION OF
LICENSE OF PASQUALE PONTORIERO

_____

Argued November 18, 2014 – Decided January 7, 2015

Before Judges Yannotti, Fasciale, and Hoffman.

On appeal from the Waterfront Commission of New York Harbor, Case No. RHA-158.

David C. Stanziale argued the cause for appellant Pasquale Pontoriero (David C. Stanziale, L.L.C. and Jon S. Deutsch, attorneys; Mr. Deutsch, of counsel; Mr. Stanziale, of counsel and on the briefs).

Phoebe S. Sorial, General Counsel, argued the cause for respondent Waterfront Commission of New York Harbor.

The opinion of the court was delivered by

HOFFMAN, J.A.D.

Appellant Pasquale Pontoriero appeals from the September 18, 2012 order of the Waterfront Commission of New York Harbor ("Commission") revoking his license to work as a hiring agent on the New Jersey waterfront.  For the reasons that follow, we affirm.

The relevant facts are essentially undisputed. The Commission is a bi-state agency charged with enforcing the Waterfront Commission Act, N.J.S.A. 32:23-1 to -225 (the "Waterfront Act"), which seeks to combat corruption and organized crime on the New Jersey and New York waterfronts. N.J.S.A. 32:23-2; Knoble v. Waterfront Comm'n of N.Y. Harbor, 67 N.J. 427, 430 (1975). The Commission licenses and regulates waterfront employees, including hiring agents. N.J.S.A. 32:23-12. Hiring agents select longshoremen for employment, N.J.S.A. 32:23-6, and the record indicates that, although they are regulated by the Commission, they maintain some discretion in their ability to award or deny work. In order to evaluate and administer licenses, the Legislature empowered the Commission to administer oaths and issue subpoenas to compel witness testimony. N.J.S.A. 32:23-10.

The Commission interviewed appellant, under oath, on March 30, 2010. We discern the following facts from that interview, and the record of the administrative hearing that followed. Tino Fiumara and Steven DePiro are members of the Genovese crime family ("Genovese family"). Fiumara, a capo,[1] had a reputation

---

[1] See State v. Cagno, 211 N.J. 488, 495 (2012), cert. denied, ___ U.S. ___, 133 S. Ct. 877, 184 L. Ed. 2d 687 (2013) explaining
(continued)

for ruthlessness and violence, and oversaw the New Jersey waterfront with an "iron grip" until his death in 2010. DePiro began running the Newark ports for Fiumara in 2005.

In 1980 Fiumara was convicted of racketeering, and DePiro was convicted of racketeering in 1999. Both were convicted of conspiracy to commit misprision of a felony in 2003. More recently, in 2011, DePiro was indicted for racketeering and extortion on behalf of the Genovese family. Both men have been the subject of numerous newspaper articles concerning their illegal activities.

Appellant spent time growing up at his grandmother's house in the Ironbound/Down Neck neighborhood of Newark. Appellant began working as a longshoreman on the Newark waterfront in 1995 or 1996. On October 10, 2006, the Commission awarded appellant a permanent license to work as a hiring agent.

In his spare time, appellant served as the secretary and treasurer for the Spilingese Social Club, a known gathering place of the Genovese family. Through social and family contacts, appellant was acquainted with numerous individuals

---

(continued)
that "La Cosa Nostra families are organized on a hierarchical basis. At the bottom of this hierarchy are 'soldiers' who have taken an oath of loyalty to the family and are organized into functional units called 'crews,' which are headed by 'captains' or 'capos.'"

known to be members or associates of the Genovese family, including Fiumara and DePiro. Appellant's father introduced appellant to Fiumara around 1985. Appellant's father also posted bail for Fiumara in 2002. Appellant was generally aware of Fiumara's association with organized crime.

In the summer of 2009, appellant attended a private birthday dinner for Fiumara. Appellant drove his father to the law offices of Fiumara's lawyer, Salvatore Alfano, in Bloomfield. There they met Dan Seratelli, his wife, Anthony Puciarello (Fiumara's cousin), and his wife. A waiting limousine drove the group to a steakhouse in Long Island, New York, where they joined Fiumara and his girlfriend. According to Alfano, when Fiumara saw appellant, he said something to the effect, "I haven't seen you in a long time. You got fat." After dinner, appellant and his father left in the limousine.

Appellant also visited DePiro at his home twice in the four or five months leading up to the March 30, 2010 hearing. Appellant alleged that on both occasions he was nearby buying sausage with his coworker Sal LaGrasso (DePiro's cousin), and, on LaGrasso's request, briefly dropped in on DePiro to catch up. LaGrasso was indicted in 2011, along with DePiro, for extorting money from waterfront employees. While appellant estimated that the visits lasted less than twenty minutes, surveillance footage

4

revealed that one of those visits lasted approximately one hour. Appellant denied knowing that DePiro was involved with organized crime in any way.

In September of 2010, as a result of appellant's testimony, the Commission brought administrative proceedings to revoke, cancel, or suspend appellant's hiring agent license for "association" with Fiumara and DePiro "inimical to the policies" of the Waterfront Act, contrary to N.J.S.A. 32:23-93(6) to -(7) ("the underlying statute"), and for lack of good character and integrity, contrary to N.J.S.A. 32:23-14(a), -18(a). An Administrative Law Judge ("ALJ") presided over the hearings. Appellant moved to stay the proceedings pending the resolution of ongoing criminal investigations, which involved federal and state grand jury subpoenas. The ALJ denied the motion to stay, and held eight hearings between January 19, 2011 and March 7, 2012.

Notwithstanding his prior testimony, appellant invoked his Fifth Amendment privilege against self-incrimination, and refused to answer any questions. Of relevance here, appellant refused to answer questions regarding whether he had ever paid for a position at the waterfront, whether his father was known as "Tino's guy" (referring to Tino Fiumara), and whether he

favored hiring particular longshoremen based on Genovese family instructions.

The Commission presented expert testimony from Robert Stewart, former Chief of the Organized Crime Strike Force for the U.S. Attorney's Newark Office, and an expert on organized crime and the Genovese family. Stewart testified that the sole imperative of the Genovese family is to generate money for the family, and that this goal is inimical to the public interest. The Genovese family extorts money from the waterfront by instructing hiring agents to deny jobs to recalcitrant longshoremen. In this way, hiring agents are the keystone to the Genovese family's waterfront extortion rackets.

Stewart opined that rumors of associations between waterfront supervisors and organized crime members "spread across the piers like wildfire" in the tight-knit waterfront community. He said, "The piers are rife with gossip about who is who, who is mobbed up, who you should stay away from." Stewart opined that such rumors created the belief that organized crime controlled the industry, strengthening the grip of the Genovese family over the longshoremen. Stewart added that "[t]here [was] no doubt in [his] mind" that meeting with Fiumara and DePiro "create[d] a reasonable belief" appellant was complicit in organized crime.

Alfano and Seratelli testified regarding Fiumara's birthday dinner, corroborating appellant's account. DePiro and Fiumara's girlfriend refused to testify, and the parties stipulated that, if called, they would invoke the Fifth Amendment in response to all questions. Appellant's father also refused to testify, citing poor health.

Appellant presented expert testimony from Michael Levine, a former undercover federal agent, and an expert in organized crime. Levine admitted that the scope of his expertise did not extend to administrative hearings, and that he had evaluated the case from a purely criminal perspective. Levine generally concurred with Stewart's testimony regarding the impact of rumors of associations between waterfront supervisors and organized crime members on the waterfront, and agreed that "wiseguys" publicize their criminal reputation in order to increase their power. Appellant also presented testimony from Jeffrey Schoen, the Commission's Director of Law and Licensing, and two of appellant's supervisors, all of whom testified to appellant's unblemished employment history. Additionally, appellant introduced a letter of good character from Nicholas DiMarzio, the Bishop of Brooklyn.

On August 16, 2012, the ALJ issued an extensive written opinion finding that all charges against appellant had been

"established by a clear preponderance of the evidence." In interpreting the underlying statute, the ALJ adopted the Commission's definition of "association": "to keep company, as a friend, companion or ally." As for the definition of "inimical" contained within the same statute, the ALJ turned to the definition developed by the New Jersey Casino Control Commission ("CCC") under the New Jersey Casino Control Act, N.J.S.A. 5:12-1 to -233 ("CCA"): "adverse to the public confidence and trust in the credibility, integrity and stability of casino gaming operations and in the strict regulatory process created by the [CCA]." Application of Bayshore Rebar, Inc., CCC 08-0318-SI at 52, initial decision, (March 23, 2010); accord Div. of Gaming v. Staluppi, 94 N.J.A.R.2d (Vol. 1) 31, 36 (CCC).

Next, the ALJ found that the Waterfront Act does not require proof that the association was for a criminal purpose, or that appellant knew or should have known of Fiumara and DePiro's criminal history. In particular, the ALJ relied upon a 2007 amendment to N.J.S.A. 32:23-93(6) that removed the requirement that "the licensee or registrant knows or should know" of the associate's criminal reputation. L. 2007, c. 333, § 2. The ALJ, therefore, effectively concluded that the alleged charges are strict liability regulations.

The ALJ chose to draw an adverse inference from appellant's invocation of the Fifth Amendment. He held that the transcript of the March 30, 2010 hearing provided insufficient testimony to overcome these inferences, as it was a poor substitute for live testimony. He conceded there was "no evidence that the [birthday] dinner . . . was anything more than a social occasion[,]" but concluded that the meeting "created an unacceptable risk of corruption" and "would reasonably cause an ordinary longshoreman to believe that [appellant] had been compromised or [was] otherwise vulnerable to influence from reported racketeers." As to DePiro, the ALJ similarly concluded that appellant's two meetings created "an unacceptable risk of corruption" inimical to the Waterfront Act.

On September 18, 2012, the Commission considered the record of the proceedings, including the findings and recommendations of the ALJ, and found that appellant knowingly associated with Fiumara and DePiro under circumstance where such association creates a reasonable belief that his participation in any waterfront activity would be inimical to the policies of the Waterfront Act. The Commission also found that appellant lacks good character and integrity within the meaning of the Waterfront Act, based on his association with Fiumara and

DePiro, and revoked appellant's license as a hiring agent, effective immediately.

On appeal, appellant argues that the Commission's findings and decision were arbitrary, capricious, and unreasonable because: (1) the factual findings were not supported by sufficient credible evidence; (2) the ALJ and Commission's interpretation of the Waterfront Act as a strict liability statute was erroneous; (3) the ALJ and the Commission failed to use the proper definitions of "association" and "inimical"; (4) the relevant sections of the Waterfront Act are unconstitutionally vague; (5) the finding that appellant lacked good character and integrity was not supported by competent, credible evidence; and (6) the revocation of appellant's license was disproportionate to the alleged offenses and shocking to one's sense of fairness.

II.

When reviewing an administrative agency's final quasi-judicial decision, it should only be reversed on "a 'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record[.]" Circus Liquors, Inc. v. Middletown Twp., 199 N.J. 1, 9 (2009). We consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial

evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Id. at 10 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

We only reverse agency fact-finding if "'clearly . . . mistaken . . . and so plainly unwarranted that the interests of justice demand intervention and correction[.]'" Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88 (2001) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)). Reasonable credibility determinations are afforded similar deference. Id. at 588. Lastly, "[w]hen resolution of a legal question turns on factual issues within the special province of an administrative agency, those mixed questions of law and fact are to be resolved based on the agency's fact finding." Ibid.

A.

We first address appellant's contention that the ALJ and the Commission improperly interpreted the underlying statute. N.J.S.A. 32:23-93 provides that the Commission may revoke or suspend a license for:

(6) Association with a person who has been identified by a federal, state or local law enforcement agency as a member or associate of an organized crime group, a terrorist group, or a career offender cartel, or who

11

is a career offender, under circumstances where such association creates a reasonable belief that the participation of the licensee or registrant in any activity required to be licensed or registered under this act would be inimical to the policies of [the Waterfront Act].

. . . .

(7) . . . [K]nowing association with a person who has been convicted of a racketeering activity by a court of the United States, or any state or territory thereof under circumstances where such association creates a reasonable belief that the participation of the licensee or registrant in any activity required to be licensed or registered under this act would be inimical to the policies of [the Act].

No courts have interpreted these provisions. Accordingly, this is a case of first impression, and we turn to the canons of statutory interpretation.[2]

"When interpreting a statute, our main objective is to further the Legislature's intent." TAC Assocs. v. N.J. Dep't of Envtl. Prot., 202 N.J. 533, 540 (2010). We first look "to the plain language of the statute in question." Id. at 541. We give those "'words their ordinary meaning and significance.'" James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 566 (2014) (quoting Perez v. Prof'lly Green, L.L.C., 215 N.J. 388, 399 (2013)).

---

[2] Appellant does not dispute that Fiumara and DePiro qualify as members of an organized crime group, career offenders, and convicted racketeers. Accordingly, we need not address that element of the analysis.

When the plain meaning is unclear or ambiguous, we next consider extrinsic evidence of the Legislature's intent, including legislative history and statutory context. TAC, supra, 202 N.J. at 541.

However, where a statute is ambiguous, we give substantial deference to the interpretation of the agency empowered to enforce it. Ibid. In those circumstances, the court "need not conclude that the agency construction was the only one it permissibly could have adopted, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding[,]" but only whether the interpretation is "plainly unreasonable." Matturri v. Bd. of Trs. of the Judicial Ret. Sys., 173 N.J. 368, 382 (2002) (citations and internal quotation marks omitted).

In the context of the federal prosecution of organized crime, the term "association" has a specific meaning, commonly referred to as an "association-in-fact," which is one method of demonstrating participation in a criminal enterprise. See, e.g., Boyle v. United States, 556 U.S. 938, 944-45, 129 S. Ct. 2237, 2243, 173 L. Ed. 2d 1265, 1274-75 (2009); 18 U.S.C.A. § 1961(4) ("'[E]nterprise' includes any . . . association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]").

Here, however, we are persuaded that the Legislature intended the common form of the term "association." As applied by the ALJ, "association" is the noun form of the verb "associate," which Webster's New College Dictionary 70 (3rd ed. 2005), defines as: "[t]o keep company." The CCA guides our analysis. N.J.S.A. 5:12-86.f ("subsection f") disqualifies any casino license applicant who is an "associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of [the CCA] and to gaming operations." As with the statute here, subsection f does not define the term "associate." The similarities between subsection f and the underlying statute are striking, and the CCA has been the subject of greater litigation and judicial interpretation.[3] Accordingly, we look to those cases to inform our decision.

In Staluppi, supra, 94 N.J.A.R.2d at 37, the CCC denied a finding of inimical association under subsection f. There, rather than analyzing the existence of an association as an independent element, the CCC implicitly applied the word's ordinary meaning, and considered instead whether the

---

[3] Although the Waterfront Act predates the CCA, the subsections of the Waterfront Act at issue here were substantially amended in 2007 to conform with the CCA. L. 2007, c. 333, § 2.

relationship was inimical to the purposes of the CCA.  Id. at 36 ("The [CCA] has long recognized that not every relationship with career offenders will be the basis for exclusion from the casinos . . . .  <u>The nature, quality and scope of the association must be evaluated</u> . . . ." (emphasis added) (citation omitted)).

In <u>In re Hotel & Restaurant Employees & Bartenders International Union Local 54</u>, 203 <u>N.J. Super.</u> 297, 325-26 (App. Div.), <u>certif. denied</u>, 102 <u>N.J.</u> 352 (1985), <u>cert. denied</u>, 475 <u>U.S.</u> 1085, 106 <u>S. Ct.</u> 1467, 89 <u>L. Ed.</u> 2d 723 (1986), we implicitly approved of this approach to subsection f.  There, we considered an argument that subsection f was unconstitutional under First Amendment freedom of association, as it regulated "a purely social relationship . . . ."  <u>Local 54</u>, <u>supra</u>, 203 <u>N.J. Super.</u> at 325.

Although the evidence in that case demonstrated substantial interaction, we upheld the statute on the assumption that it encompassed purely social interaction.  <u>Id.</u> at 318, 326.  Moreover, although we distinguished the issues of "whether [respondents] were associated with members of a career offender cartel, and . . . whether that association was . . . inimical . . . [,]" we did not apply a heightened legal definition of the term "associate."  <u>Id.</u> at 309.

Most importantly, applying a heightened legal definition of the term "association" would undermine the legislative intent of the Waterfront Act by implying a category of relationships that are inimical to the Waterfront Act, but are not "associations." Under this contrary reading, the underlying statute would permit an inimical but non-association relationship. The Legislature clearly did not intend such a result.[4]

As the statute is silent on the definition of "association," as the Commission's interpretation is not plainly unreasonable, and as the Commission's reading best preserves the legislative intent of the Waterfront Act, we affirm its interpretation. "Association," in the context of the underlying statute, encompasses the ordinary meaning of the term: — to keep company, as a friend, companion or ally — and encompasses both social and economic relationships. Accordingly, the substantive element of the underlying statute is whether appellant's relationship with the Genovese family, even if only purely social, "creates a reasonable belief that the participation of the licensee [as a hiring agent] would be inimical to the policies of this act." N.J.S.A. 32:23-93(6) to -(7).

---

[4] Consider, for example, a hiring agent that only briefly meets a Genovese family capo, but accepts a gift from that person. While there is not a substantial contact, there is good reason to doubt the hiring agent's character.

Thus, we turn to the definition of "inimical," and the proper standard for a finding of inimical association. The Commission adopted the ALJ's definition of "inimical": "adverse to the public confidence, trust, credibility, integrity and stability of the industry," as discussed by the CCC in Bayshore, supra, CCC 09-0318-S1 at 52. This accords with our own interpretation of the CCA where we decided inimical to mean "harmful or adverse." Local 54, supra, 203 N.J. Super. at 316 (citation and internal quotation marks omitted). We conclude that the term "inimical," as used in the Waterfront Act, means adverse to the public confidence and trust in the credibility, integrity and stability of the waterfront and in the strict regulatory process of the Act.

Finally, we address the proper standard for finding an inimical association. Here, the ALJ imposed no burden on the Commission to show: (1) appellant met with Fiumara and DePiro for an illegitimate purpose; or (2) appellant knew or should have known of Fiumara's and DePiro's criminal histories. In rejecting these two elements, the ALJ effectively imposed a strict liability interpretation of the underlying statute.

We have held that, given the highly regulated and sensitive nature of the casino industry, subsection f could be legitimately construed to encompass "unknowing or otherwise

17                                                    A-1006-12T4

innocent association . . . ." In re Boardwalk Regency Corp. for Casino License, 180 N.J. Super. 324, 340-41 (App. Div. 1981), aff'd as modified, 90 N.J. 361, appeal dismissed sub nom. Perlman v. Attorney Gen. of N.J., 459 U.S. 1981, 103 S. Ct. 562, 74 L. Ed. 2d 927 (1982). Here, the history of corruption on the waterfront, as well as the need for strict regulation, is well established:

> [T]he conditions under which waterfront labor is employed . . . are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees[.]
>
> [N.J.S.A. 32:23-2; see also N.J.S.A. 32:23-3 to -5.]

Moreover, as noted by the ALJ, a strict liability interpretation is consistent with the legislative history of N.J.S.A. 32:23-93. Prior to 2007, the statute prohibited:

> Association with a person whom the licensee or registrant knows or should know is a member or associate of an organized crime group or cartel or of a terrorist group or cartel.
>
> [L. 2005, c. 313, § 6 (emphasis added).]

The stated intent of the 2007 amendment was to "replace [the then] current requirement that the applicant, licensee, or registrant knows or should know of the associate's career offender status or affiliation with the group or cartel[,]" with the requirement of "circumstances under which [the association] creates a reasonable belief that the participation of the . . . licensee . . . in any activity required to be licensed . . . under the [Act] would be inimical to the policies of the [A]ct." Assembly Transp. and Pub. Works Comm., Statement to A. 4088 (June 14, 2007). Thus, the Legislature explicitly abrogated any specific requirement of actual or constructive knowledge.

We briefly note that N.J.S.A. 32:23-93(7) departs from N.J.S.A. 32:23-93(6) by prohibiting "knowing association" with a convicted racketeer. Although the two subsections contrast, we do not believe that the Legislature intended to apply a heightened burden on the Commission under N.J.S.A. 32:23-93(7). Accordingly, we interpret "knowing association" only as an exclusion of happenstance, inadvertent, or unplanned encounters.

Similarly, the current wording of N.J.S.A. 32:23-93(6) to -(7), as well as the ALJ's and the Commission's definition of "inimical," supports the conclusion that the statute is just as concerned with the perception of corruption as it is with actual collusion between hiring agents and organized crime. The

A-1006-12T4

alleged association need only "create a reasonable belief" that the licensee's continued participation is inimical to the Waterfront Act, and the licensee's participation is inimical if it is adverse to public confidence and trust. N.J.S.A. 32:23-93(6) to -(7). The record here further supports this conclusion, as the Genovese family's control of the waterfront depends just as much on the perception of influence as it does on actual influence. Thus, we affirm the Commission's decision not to impute a requirement of criminal or illegitimate purpose.

Notably, adoption of this strict liability approach, as well as our definition of "association," accords with published New York case law concerning New York's codification of the Waterfront Act, NY Unconsol. Law c. 307, § 5-i (Consol. 2014). See, e.g., In re Dillin v. Waterfront Comm'n of N.Y. Harbor, 990 N.Y.S.2d 170, (App. Div. 2014). In Dillin, petitioner longshoreman Margaret Dillin attended two parties hosted by a member of the Genovese family, and bragged about her relationship with him. Id. at 172.

The ALJ, applying a broad definition of "association," and the same strict liability theory applied here, recommended revocation of Dillin's license, and the Commission adopted the ALJ's recommendation. In re Dillin v. Waterfront Comm'n of N.Y. Harbor, No. 100575/13 (N.Y. Sup. Ct. Aug. 15, 2013) (slip op. at

1-10). The trial court reversed, rejecting the ALJ's definition of "association," and finding that "this section of the [Act] is not a strict liability section." Id. at 10. However, the New York Appellate Division, noting that the Commission's findings were supported by substantial evidence, held that Dillin "engaged in conduct which potentially undermine[d] the Commission's continuing efforts to ensure public safety by reducing corruption on the waterfront[,]" reversed the trial court, and confirmed the Commission's original determination. Dillin, supra, 990 N.Y.S.2d at 171.

We disagree, however, with the Commissioner's present rejection of the factors articulated in Staluppi, supra, 94 N.J.A.R.2d at 36. There, the CCC identified several factors relevant to the inimical nature of an association. Ibid. Those factors effectively categorize the characteristics of a relationship that are relevant to the instant analysis. While application of strict liability means that the Commission can carry its burden without demonstrating illegitimate purpose or knowledge of the associate's criminal history, those facts are still clearly relevant to whether or not an association is inimical to the Waterfront Act.

Given the Commission's discretion in applying strict liability, the wording and legislative history of the underlying

statute, and the evidence in the record that the mere appearance of corruption strengthens the grip of the Genovese family on the waterfront, we conclude that a finding of inimical association, here, rests upon whether a reasonably objective observer could believe that the criminal associate could influence the licensee in his or her role as a worker regulated by the Act.

This standard is meant to encompass the risk of actual corruption as well as any reasonable perception of corruption by the public. Additionally, drawing from Staluppi, supra, 94 N.J.A.R.2d at 36, we adopt the following as a set of non-dispositive factors relevant to this standard:

> (1) The nature and sensitivity of the licensee's position;
>
> (2) The time elapsed since the licensee's last interaction with the associate;
>
> (3) The duration and frequency of the association;
>
> (4) The purpose and nature of the association;
>
> (5) Whether the association was attenuated through third-parties;
>
> (6) The associate's character and reputation;
>
> (7) The licensee's knowledge or reasonable efforts to determine the associate's character and reputation;
>
> (8) If there is more than one associate, the number of associates, and the relationship amongst them;

(9) Termination of the association, if any;

(10) The reasons for any such termination; and

(11) Any other relevant facts or circumstances.

B.

Applying this framework to the case under review, we conclude that the record supports the Commission's fact-finding and conclusions. As noted, appellant spent part of his childhood growing up in a neighborhood tied to the Genovese family, and later served as the secretary and treasurer for a known Genovese family gathering place. Appellant ultimately secured employment as a hiring agent, a position that is highly sensitive to corruption, and that serves as the keystone to the Genovese family's extortion rackets on the waterfront.

Appellant attended a private birthday dinner for Fiumara, an old family friend. Fiumara had a criminal record, and was widely-known as a ruthless and violent Genovese family capo. Appellant then visited DePiro at his house on two occasions, in the company of a coworker also tied to the Genovese family. DePiro was Fiumara's right-hand man, controlling the extortion rackets on the waterfront, and although appellant disclaimed knowledge of DePiro's criminal history, his role in the Genovese family was the subject of numerous news articles. Lastly, when questioned about their relationship, both appellant and DePiro

23

pled the Fifth Amendment, appropriately drawing an adverse inference from the ALJ.

Given these facts, the record supports the conclusion that appellant's association with Fiumara and DePiro created "an unacceptable risk of corruption." Moreover, from these facts, a reasonable observer could conclude that Fiumara and DePiro held influence over appellant in his role as a hiring agent. Accordingly, the association is inimical, as adverse to the public confidence and trust in the credibility, integrity and stability of the waterfront and in the strict regulatory process of the Waterfront Act. Therefore, we affirm the Commission's decision as to the underlying statute. As a derivative charge, we similarly affirm as to lack of good character and integrity, under N.J.S.A. 32:23-14(a), -18(a).

## C.

Appellant next argues that the underlying statute is unconstitutionally vague on its face. "A statute . . . is facially unconstitutional for vagueness if it [is] so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Karins v. Atl. City, 152 N.J. 532, 541 (1998) (citations and quotation marks omitted). A civil statute will only be struck down if it is "impermissibly vague in all applications." Binkowski v. State, 322 N.J. Super.

359, 381 (App. Div. 1999) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102 S. Ct. 1186, 1193, 71 L. Ed. 2d 362, 371 (1982)).  "The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  Jordan v. De George, 341 U.S. 223, 231-32, 71 S. Ct. 703, 708, 95 L. Ed. 886, 892 (1951).

We have repeatedly upheld the analogous provisions of the CCA against claims of vagueness.  See State, Dep't of Law & Pub. Safety, Div. of Gaming Enforcement v. Merlino, 216 N.J. Super. 579, 585 (App. Div. 1987), aff'd o.b. 109 N.J. 134 (1988) ("[T]he inimicality test has twice been upheld against a claim of vagueness[.]"); Local 54, supra, 203 N.J. Super. at 334; Boardwalk Regency, supra, 180 N.J. Super. at 347.  As subsection f is sufficiently definite to overcome arguments of facial vagueness, so too is the nearly identical language of the underlying statute.

D.

Finally, appellant argues that the revocation of his license was a disproportionate punishment to the charges alleged.  "[W]hen reviewing administrative sanctions, appellate courts should consider whether the 'punishment is so disproportionate to the offense, in the light of all of the

25

circumstances, as to be shocking to one's sense of fairness.'" In re Stallworth, 208 N.J. 182, 195 (2011) (quoting In re Carter, 191 N.J. 474, 484 (2007)).

Termination of employment for a single incident is within an agency's discretion where the work is of a sensitive nature, and where the employee's conduct demonstrates a lack of honesty and good character. Knoble, supra, 67 N.J. at 431-32. Here, revocation of appellant's license would deprive him of employment in the field that he has worked for approximately fourteen years.

Appellant alleges, and the record supports, that he has an otherwise unblemished employment history. However, appellant's position as a hiring agent is a sensitive position, granting discretionary authority over longshoremen, and serving as the keystone to corruption on the waterfront. Appellant's association with the Genovese family demonstrates a lack of good character and integrity, and allowing him to continue working as a hiring agent would further undermine public confidence in the integrity and stability of the operation of the waterfront. We therefore find that the Commission's punishment was not disproportionate to the offenses under review.

Accordingly, we conclude that the Commission's findings of fact and conclusions of law are legally sound and supported by

sufficient credible evidence of record.  A reasonably objective observer could believe that the Genovese family could influence appellant in his role as a hiring agent.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27                                              A-1006-12T4