**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3445-19

IN THE MATTER OF
MICHAEL INGRASSELINO,
ELMWOOD PARK, POLICE
DEPARTMENT.

_____

Argued December 8, 2021 – Decided March 29, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-924.

Lauren Sandy argued the cause for appellant Michael Ingrasselino.

Arthur R. Thibault, Jr., argued the cause for respondent Borough of Elmwood Park (Apruzzese, McDermott, Mastro & Murphy, PC, attorneys; Arthur R. Thibault, Jr., of counsel and on the brief; Kyle J. Trent, on the brief).

Andrew J. Bruck, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Michael Ingrasselino, a former police officer with the Elmwood Park Police Department, appeals from a final agency decision by the Civil Service Commission (Commission), which affirmed a decision to terminate him. Because the Commission's decision was not arbitrary, capricious, or unreasonable and its factual findings were supported by substantial credible evidence in the record, we affirm.

I.

We derive these facts from the record. The Department hired Ingrasselino as a police officer in May 2006. In June 2017, an internal-affairs investigation of a police lieutenant revealed Ingrasselino may have falsified Daily Vehicle Inspection and Attendance Reports (DVIARs) by overstating the number of miles he had driven during his shifts. On November 15, 2017, Ingrasselino was advised in writing that an internal-affairs complaint had been made against him regarding violations that allegedly occurred in 2015 and 2016. Ingrasselino was suspended with pay on December 29, 2017, pending further investigation.

The investigation of Ingrasselino was conducted by internal-affairs investigator Captain Marc D'Amore, who was fully authorized to conduct the investigation, unlike the investigator in O'Rourke v. City of Lambertville, 405 N.J. Super. 8, 21 (App. Div. 2008), on which Ingrasselino relies. In his report,

D'Amore found, among other things, that Ingrasselino had falsified over one hundred DVIARs by misstating his total miles driven,[1] the number of summonses he had issued, and the amount of fuel dispensed into his patrol vehicle.

On June 4, 2018, the Department suspended Ingrasselino without pay and issued a Preliminary Notice of Disciplinary Action against him, alleging he had:

> while on duty and in disregard of and insubordinate to Departmental Rules, Regulations and Policies, falsified on numerous occasions his [DVIARs], including but not limited to the number of miles he drove during his tour, the number of tickets he issued, and the amount of fuel he dispensed into patrol vehicles during the years of 2015 and 2016.

The Department also asserted Ingrasselino had made untruthful statements during his internal-affairs interview. The Department charged him with violations of N.J.A.C. 4A:2-2.3(a)(1), (2), (6), (7), and (12), for, respectively, incompetency, inefficiency or failure to perform duties, insubordination, conduct unbecoming a public employee, neglect of duty, and "[o]ther sufficient cause." The Department also charged him with violations of several

---

[1] D'Amore testified he did not consider DVIARs in which Ingrasselino had reported only five miles more or less than what the GPS unit had recorded. Although he frequently significantly overreported his mileage by more than five miles, Ingrasselino did not underreport his mileage by more than five miles.

departmental rules and regulations.  After a local disciplinary hearing was held, the Department issued a Final Notice of Disciplinary Action on September 24, 2018, sustaining most of the charges and terminating him.

Ingrasselino appealed.  The Commission transferred the case to the Office of Administrative Law as a contested case.  An administrative law judge (ALJ) conducted a multi-day hearing.

At the hearing, the Borough of Elmwood Park (Borough) called as its first witness internal-affairs investigator D'Amore, who testified the Department had an unwritten rule requiring patrol officers to drive forty miles during a twelve-hour shift.  Officers were required to report accurately on their DVIARs at the end of their shifts the number of miles they had driven, summonses they had issued, and gallons of fuel dispensed into their vehicles.  According to D'Amore, a police lieutenant had been accused of improperly ordering an officer in his unit to report on her DVIARs she had driven forty miles during her shifts regardless of whether she actually had driven forty miles.  During his investigation of that complaint, D'Amore reviewed the DVIARs of officers in the lieutenant's unit who had reported on their DVIARs driving forty miles during their shifts.  He compared what an officer had reported on a DVIAR as the total miles driven with what the officer's vehicle's GPS unit had recorded.

D'Amore initially discovered discrepancies in two of Ingrasselino's DVIARs. As stated in D'Amore's report, in that initial review Ingrasselino was the only officer whose reported miles differed from the GPS unit's recorded miles. As a result of that discovery, D'Amore began an internal-affairs investigation focused on Ingrasselino.

In that investigation, for every day Ingrasselino was on duty in 2015 and 2016, D'Amore compared the total miles driven that Ingrasselino had reported on his DVIARs with the total miles recorded by his vehicle's GPS unit. D'Amore ultimately found eighty-four instances in which Ingrasselino had reported on his DVIARs total miles driven that were substantially more than the total miles recorded by the GPS unit. D'Amore also noticed in Ingrasselino's DVIARs a "roll-back" pattern, meaning Ingrasselino's reported starting mileage on his DVIARs was less than the ending vehicle mileage reported by the previous officer who had utilized the same vehicle. D'Amore testified he saw that roll-back activity on approximately twenty-two of his DVIARs.

D'Amore found other discrepancies in Ingrasselino's DVIARs. He identified seventeen occasions Ingrasselino had reported issuing more summonses than court records reflected and twenty-three occasions he had issued fewer summonses than court records reflected. D'Amore also found

discrepancies regarding Ingrasselino's fuel-usage reports. Patrol officers were required at the end of their shifts to fuel their patrol vehicles at the gasoline pumps of the Borough's Department of Public Works and to document accurately the amount of fuel dispensed into their vehicle. D'Amore reviewed GPS reports for the days Ingrasselino had reported fueling his patrol vehicle and found five instances in which the GPS report showed Ingrasselino had not travelled anywhere near the Public Works gasoline pumps or any other gas station located in the Borough, demonstrating Ingrasselino had not fueled his vehicle on those dates and had falsified his DVIARs by reporting he had.

In his report, D'Amore found Ingrasselino had "falsified and/or placed false information on an official police report numerous times," calling into question his "ability to complete police reports truthfully and accurately." Finding Ingrasselino had committed numerous violations, D'Amore concluded: "If false information is placed on these simple, routine documents [DVIARs], Officer Ingrasselino cannot be entrusted in conducting more complex investigations which require more accurate, detailed information and future ensuing courtroom testimony."

At the hearing the Department's Chief of Police Michael Foligno testified he had reviewed D'Amore's report and believed Ingrasselino should be removed

as a result of falsifying his DVIARs because "[a]ll police officers are called to be honest and have integrity at all times, and not to put false information, inaccurate information, on any document or report, because that compromises the officer's integrity."  In Foligno's view, if Ingrasselino could not be trusted to complete the simple task of accurately reporting information on his DVIARs, the Department could not trust him to deal with more difficult tasks, such as testifying in court or dealing with evidence of a crime.  After moving documents into evidence, the Borough rested its case.

Ingrasselino called as his first witness the Borough's chief financial officer, who testified about Ingrasselino's suspension without pay and unemployment-benefits proceedings.

Months after the Borough had rested its case, after Ingrasselino already had called his first witness, and one week before the third hearing day, Ingrasselino advised the ALJ he wanted to retain an expert witness to challenge the accuracy of the GPS unit.  The ALJ directed Ingrasselino to file a motion. After hearing oral argument, the ALJ denied the motion in a written opinion. The ALJ found Ingrasselino had not indicated an intention to retain an expert witness during the discovery period; had not sought "to bar the internal affairs testimony concerning the number of miles Ingrasselino drove while on patrol";

had not objected to testimony or documentary evidence regarding the GPS records; previously had identified lay witnesses who would be called but had not at that time stated an intention to call an expert witness; and had not advised anyone of his intent to use an expert witness until a week before the next hearing date long after the Borough rested, despite claiming a lack of trust of GPS records back in August 2018. After reviewing the proposed expert's report, the ALJ found it "highly speculative and hypothetical" because the expert had stated he was "not provided information that is specific to the [GPS] unit's specific abilities" and was not provided with "full data logs," making him unable to conduct "an independent review of each day's data to ensure proper calculations." The ALJ found the lack of documentation provided to and relied on by the expert "only serves to highlight the untimeliness" of the expert's "entry into the case." The ALJ held any interest favoring admission of the expert witness was substantially outweighed by a lack of probative value. He denied the motion, finding the expert had conceded the GPS unit was "able to accurately determine the unit's location at a given time within reasonable tolerances."

Ingrasselino initially presented two witnesses, his longtime friend and former Elmwood Park police officer Joseph Friedman and his father and former Elmwood Park Chief of Police Donald Ingrasselino. They both testified they

believed the charges filed against Ingrasselino were a result of bias and harassment.

Ingrasselino testified, also contending Foligno had targeted him for harassment. He confirmed he was aware since 2012 of the unwritten rule that patrol officers were expected to drive forty miles during their shifts. He asserted some discrepancies between his DVIARs and the GPS records were due to the GPS unit on some days not picking up his signal for a large portion of his shift, thus inaccurately reporting his total miles driven. He admitted "a lot of times" and "probably most of the times" he had forgotten to reset the trip monitor to zero at the start of his shift and he then guessed or estimated his mileage for those shifts. He testified it was never his intent to mislead his supervisors by falsifying his DVIARs.

The Borough called in rebuttal Foligno, two current captains, and one retired captain. Foligno denied having a vendetta against Ingrasselino. The other witnesses denied the existence of or having knowledge of any bias towards or harassment of Ingrasselino.

The ALJ denied Ingrasselino's appeal and affirmed his removal in a detailed and thorough written initial decision. The ALJ found "on eighty-four occasions, the appellant substantially overstated the number of miles he

patrolled" and "the number of occasions of false information on his mileage (84 times in the two years of service that was investigated) indicate[d] intentional conduct." He found Ingrasselino's claims that his errors on his DVIARs were unintentional, and much of his testimony, "to be not credible," finding "[e]ven though Ingrasselino knew he was merely guessing how many miles he drove, he never once in two years asked for . . . assistance to correct his alleged 'mistakes.'" The ALJ also found Ingrasselino had "frequently (40 times) incorrectly recorded the number of summonses he recorded during his shift." Because Ingrasselino had underreported the number of summonses he had issued about half the time, the ALJ found that "indicate[d] that the inaccurate recordings on the number of summonses issued was a product of negligent or possibly reckless disregard of his duty, rather than intentionally false or deceptive." The ALJ similarly found Ingrasselino had negligently and falsely reported five times he added fuel to his vehicle when the GPS proved he had not visited the Department of Public Works gasoline pumps on those days.

The ALJ considered each charge and found the following charges were sustained: incompetency and failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a police officer, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12).

He rejected Ingrasselino's claim he had become the target of a vindictive police chief when Foligno replaced his father as police chief, finding:

> If Ingrasselino was, as he and his witnesses sought to prove, a victim of being targeted, he could have[] made great effort to ensure his [DVIARs] were accurate and truthful. However, as admitted, Ingrasselino frequently overstated the miles he drove, and as shown, frequently failed to patrol as much as he was supposed to during his shift; instead chose to deliberately, or with reckless disregard for the truth, falsify his mileage records. Such conduct is certainly unbecoming a police officer.

The ALJ found Ingrasselino's conduct, "however egregious," did not constitute insubordination pursuant to N.J.A.C. 4A:2-2.3(a)(2).

The ALJ also sustained the charges of violating the following departmental rules: 2:1.3(1) for failure to conform with the policies of the Department; 2:1.3(8) for failing to perform his duties promptly, faithfully, and diligently; 3:1.5 by not performing his duties as required; and 3:7.5 by failing to perform his duties to the best of his abilities. However, the ALJ found Ingrasselino's "conduct did not rise to the level of an Ethics violation as defined by Rule 1:5-2."

The ALJ rejected Ingrasselino's remaining arguments, specifically discounting his assertions that: the GPS records could not be used against him because departmental policy prevented their use "as a tool of punishment"; and

11

the charges against him should be dismissed because they were untimely pursuant to N.J.S.A. 40A:14-147, and because the Borough had employed illegally a "civilian" named Robert Verry as an independent counsel and lead investigator in internal-affairs investigations.

The ALJ found the penalty of removal was appropriate given Ingrasselino's "egregious" conduct and that the Department "may properly infer that an officer who can't be trusted to complete and to honestly perform simple but important daily tasks such as involved here, cannot or should not be trusted with even more complex tasks as required of a police officer."

Ingrasselino filed "formal exceptions" to the initial decision. The Commission subsequently entered its final administrative action, adopting the factual findings and conclusions of the ALJ, and affirming and finding justified Ingrasselino's removal.

In this appeal, Ingrasselino argues the Commission's decision should be reversed because it was not supported by the preponderance of the credible evidence; was based on several arbitrary, capricious, and erroneous evidentiary findings; was arbitrary and capricious because it failed to implement progressive discipline; was based on an investigation that was unfair, impartial, and violative of the law; and was based on disciplinary charges that are violative of the law.

He also argues he was improperly suspended without pay and is entitled to back pay and back benefits and that the ALJ committed reversible error in denying his expert-witness motion.

## II.

Our review of an agency determination is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). An agency's determination "is entitled to affirmance so long as the determination is not arbitrary, capricious, or unreasonable, which includes examination into whether the decision lacks sufficient support in the record or involves an erroneous interpretation of law." Melnyk v. Bd. of Educ. of the Delsea Reg'l High Sch. Dist., 241 N.J. 31, 40 (2020). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014). We reverse an agency's factual findings only if "clearly . . . mistaken . . . and so plainly unwarranted that the interests of justice demand intervention and correction." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88 (2001) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)). We defer to an agency's "[r]easonable credibility determinations." In re Pontoriero, 439 N.J. Super. 24, 35 (App. Div. 2015). We are not bound by an agency's statutory interpretations or other legal decisions. Melnyk, 241 N.J. at 40. However,

13

"[w]hen resolution of a legal question turns on factual issues within the special province of an administrative agency, those mixed questions of law and fact are to be resolved based on the agency's fact finding."  Campbell, 169 N.J. at 588.

To determine whether an agency's determination is arbitrary, capricious, or unreasonable, a reviewing court is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars, 234 N.J. at 157.]

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007); see also In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020) ("Wide discretion is afforded to administrative decisions because of an agency's specialized knowledge."). "That deferential standard applies to the review of disciplinary sanctions as well."  In re Herrmann, 192 N.J. at 28.  Under that standard, the test for reviewing administrative sanctions is "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be

shocking to one's sense of fairness."  Id. at 28-29 (quoting In re Polk, 90 N.J. 550, 578 (1982)).

We affirm because the Commission's decision, as reflected in the ALJ's initial decision, meets the criteria of Allstars, 234 N.J. at 157, and Ingrasselino has failed to demonstrate the Commission's decision was arbitrary, capricious, or unreasonable; lacked sufficient support in the record; or involved an erroneous interpretation of law.  Substantial credible evidence demonstrated Ingrasselino frequently and intentionally overstated his patrol mileage and reported inaccurately other information.  In addition to D'Amore's extensive testimony and report, the ALJ and Commission had before them Ingrasselino's admission that "a lot of times" and "probably most of the times" he "would guess" at his mileage instead of accurately recording it.  As the ALJ found, "the sheer number of occasions of false information on his mileage (84 times in the two years of service, or about 25% of the time that was investigated) indicates intentional conduct."  The ALJ acted within his discretion in rejecting Ingrasselino's proffered explanations as to why his reported numbers did not match the recorded numbers and his and his witnesses' testimony regarding bias because they were not credible or sufficient to explain the volume of Ingrasselino's misstatements.  We see no reason to disturb those findings or the

15

decision of the Commission to adopt them. See <u>D.L. v. Bd. of Educ. of Princeton Reg'l Sch. Dist.</u>, 366 N.J. Super. 269, 273 (App. Div. 2004) ("We generally defer to credibility determinations made by the ALJ who had the opportunity to hear the testimony and observe the demeanor of the witnesses.").

Considering the ALJ's factual findings, we agree with the ALJ's and Commission's legal conclusions as to Ingrasselino's code and rule violations. The ALJ did not by rote find Ingrasselino had committed each of the charged violations but carefully reviewed each, sustaining some and rejecting others Ingrasselino's intentional failure to report accurately his mileage and negligent false reporting of other information, as found by the ALJ, demonstrates incompetency, failure to perform duties, conduct unbecoming a police officer, neglect of duty, failure to conform with the policies of the Department, and failure to perform his duties as required, to the best of his abilities, or promptly, faithfully, and diligently in violation of the codes and rules cited by the ALJ. A police officer "represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public . . . ." <u>Twp. of Moorestown v. Armstrong</u>, 89 N.J. Super. 560, 566 (App. Div. 1965); <u>see also</u> <u>In re Carter</u>, 191 N.J. 474, 486 (2007) (same); <u>West N.Y. v. Bock</u>, 38 N.J. 500, 522 (1962) ("While a single instance may not be sufficient,

numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty.").

We defer also to the Commission's decision to terminate Ingrasselino. The decision to terminate was not arbitrary, capricious, or unreasonable. See In re Stallworth, 208 N.J. 182, 194 (2011). Nor was it disproportionate to the offense. In re Herrmann, 192 N.J. at 28-29. Rather, it reflects the consideration that, as found by the ALJ, "an officer who can't be trusted to complete and to honestly perform simple but important daily tasks such as involved here, cannot or should not be trusted with even more complex tasks as required of a police officer." The Commission was not required to follow the theory of progressive discipline, especially when the conduct at issue "is unbecoming to the employee's position or render[ed] the employee unsuitable for continuation in the position." Id. at 33; see also In re Restrepo, 449 N.J. Super. 409, 425 (App. Div. 2017).

We see no error or abuse of discretion in the ALJ's denial of Ingrasselino's motion for leave to call an expert witness, for the reasons expressed in the ALJ's comprehensive written opinion. See In re Accutane Litig., 234 N.J. 340, 391-92 (2018) (finding we review a decision to admit or exclude an expert report under an abuse-of-discretion standard).

We find insufficient merit in Ingrasselino's remaining arguments to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION