IN THE MATTER OF THE APPLICATION OF HARRY J. KAISER FOR REGISTRATION AS A CHECKER.

HARRY J. KAISER, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 14, 1967—Decided February 20, 1967.

96

Before Judges GOLDMANN, KILKENNY and COLLESTER.

*Mr. Gerald D. Miller* argued the cause for appellant.

*Mr. Robert A. Pin* argued the cause for respondent Waterfront Commission of New York Harbor (*Mr. William Sirignano,* General Counsel to the Commission, and *Mr. Irving Malchman,* Assistant to the General Counsel, both of the New York Bar, on the brief).

The opinion of the court was delivered by
GOLDMANN, S. J. A. D. Harry J. Kaiser appeals from an order of the Waterfront Commission of New York Harbor denying his application for registration as a checker. The order recited that the Commission had duly determined that Kaiser lacked good character and integrity within the meaning of the Waterfront Commission Act, *N. J. S. A.* 32:23–105(3)(a), in that he had been convicted of four misdemeanors, mentioned hereinafter. We affirm.

As a result of a raid conducted by the State Police in July 1960 at premises occupied by Kaiser's mother in North Arlington, N. J., she and Kaiser were arrested and subsequently indicted by the Bergen County grand jury for four separate offenses stemming from that single incident: (1) maintaining

a building as a nuisance by permitting and knowingly carrying on a lottery business, in violation of *N. J. S.* 2A:130–3; (2) permitting a lottery to be conducted on the premises, contrary to *N. J. S.* 2A:121–3(c); (3) possessing lottery slips, in violation of *N. J. S.* 2A:121–3(b), and (4) conspiring to possess lottery slips, contrary to *N. J. S.* 2A:98–1 and 2. (The latter two indictments also named Kaiser's wife and one "John White," also known as "John Doe.") The raid uncovered a numbers bank operation of great magnitude: the State Police found thousands of number slips and confiscated some $275,000 in cash. Kaiser pleaded not guilty and stood trial; the jury returned a verdict of guilty on all four charges. He was thereafter sentenced to concurrent State Prison terms of 2–3 years. The convictions were affirmed on appeal. *State v. Kaiser,* 74 *N. J. Super.* 257 (*App. Div.* 1962), where a full account of the raid and its consequences is recited. The court there noted (at *page* 264) that the North Arlington premises were owned by Susan (the mother) and Harry Kaiser, and that the former made her home at that address.

Kaiser was paroled July 8, 1965 and thereafter was employed by a trucking company. A report made to the Commission by his parole officer recited that Kaiser had done well on parole and complied with all rules and regulations; it was not anticipated that he would be in trouble with the authorities. The officer gave Kaiser "a good recommendation."

The judgment records set out in the appendix would indicate that Kaiser had been convicted on June 23, 1961 for conspiracy, on November 9, 1962 for maintaining a nuisance, and on April 7, 1964 for permitting a lottery on the premises and for possession of lottery slips. At first blush this would indicate that Kaiser had been convicted on separate occasions for four unrelated offenses. However, the record (including the judgments) and Kaiser's testimony with relation thereto when he appeared at a hearing held by the Commission on his application, indicate that the four offenses were based upon a single event, the July 1960 raid, and that he had originally been sentenced on all four charges on June 23, 1961.

In his report to the Commission recommending a denial of the application, the hearing officer specifically noted that his recommendation was based on the ground that Kaiser did not possess good character and integrity. He did not base it on Kaiser's being an habitual offender, for it is quite clear from the record that he understood that the four offenses all stemmed from the same event. The hearing officer made the following findings and recommendations:

"I find that Kaiser, as charged by the Commission, was convicted of four serious gambling charges in New Jersey, despite his claim of innocence and the exculpations he offered at the Hearing. Conceding his stable family status and working record and noting the positive Recommendations of the Parole Report, I am still constrained to rule that the jury verdicts establishing his involvement in so vast an illegal gambling enterprise disqualify him from such a trusted position as that of waterfront checker. He does not, in my opinion, possess the good character and integrity required to monitor the movements of cargo and accordingly, I recommend that his application be denied."

The Commission adopted the recommendation and, as noted, expressly denied Kaiser's application because he lacked good character and integrity.

Under the Waterfront Commission Act, *L.* 1953, *c.* 202, as amended (*N. J. S. A.* 32:23–1 *et seq.*), all longshoremen within the Port of New York district are required to be registered with the Commission. *N. J. S. A.* 32:23–27. As originally enacted in 1953, "longshoreman" was broadly defined so as to include a checker, *i. e.,* any person employed "for work at a pier or other waterfront terminal." *N. J. S. A.* 32:23–6. By later amendment, set out in *N. J. S. A.* 32:23–85, "checker" was defined as follows:

" 'Checker' shall mean a longshoreman who is employed to engage in direct and immediate checking of waterborne freight or of the custodial accounting therefor or in the recording or tabulation of the hours worked at piers or other waterfront terminals by natural persons employed by carriers of freight by water or stevedores."

By legislation effective in 1957, the Legislatures of New Jersey and New York (*L.* 1956, *c.* 194, § 6; *N. Y. Laws*

1957, c. 188, *McKinney's Unconsol. Laws*, § 9901 *et seq.*) amended the Waterfront Commission Act so as to establish within the longshoremen's register a list of all qualified longshoremen eligible for employment as checkers, and directed that no person be registered as a checker unless the Commission was satisfied that he possessed good character and integrity. *Subsection* 5-n of our 1956 amendatory act (*N. J. S. A.* 32:23-105), provides in material part that

"(1) The commission shall establish within the longshoremen's register a list of all qualified longshoremen eligible, as hereinafter provided, for employment as checkers in the Port of New York District. No person shall act as a checker within the Port of New York District unless at the time he is included in the longshoremen's register as a checker, and no person shall employ another to work as a checker within the Port of New York District unless at the time such other person is included in the longshoremen's register as a checker.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

(3) No person shall be included in the longshoremen's register as a checker

(a) Unless the commission shall be satisfied that the applicant possesses good character and integrity;

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊"

The Legislature has entrusted to the Waterfront Commission the safeguarding of the public interest on the New York Harbor waterfront. It was common knowledge prior to the time New York and New Jersey entered into a compact setting up the Waterfront Commission that there was an unwholesome concentration of criminals on the waterfront. One of the principal purposes of the Waterfront Commission was to get rid of this element, and to that end the act empowered the Commission to bar persons whom it determined to be unsuitable for waterfront employment by reason of their criminal records. See, generally, *Hazleton v. Murray,* 21 *N. J.* 115 (1956).

That gambling has been one of the conditions which has plagued the waterfront is evidenced by the fact that in 1954 the Legislatures of New York and New Jersey amended the

Waterfront Commission Act (*L.* 1954, *c.* 14, § 9; *N. Y. Laws* 1954, *c.* 220; *N. J. S. A.* 32:23–93) to make conviction of any gambling crime or offense committed at or on a pier or other waterfront terminal, or within 500' thereof, a specific ground for revoking or suspending any license or registration. We have held that a single conviction for possession of horse-race policy slips afforded sufficient ground not only for denying an application for registration as a checker, but also for revoking registration as a longshoreman. *Waterfront Commission of New York Harbor v. Pasquale,* 65 *N. J. Super.* 498 (*App. Div.* 1961). If a single conviction for gambling on a waterfront is sufficient cause for revoking the registration of a longshoreman (a person held to a lower standard of conduct than a checker and not required by the act to possess good character and integrity), then it cannot reasonably be said that the Commission is guilty of arbitrary or capricious action in denying registration as a checker to one like Kaiser, a man previously convicted as a large-scale numbers operator.

Kaiser contends that his past convictions for violating the gambling laws should not be determinative of the fact that he lacks good character and integrity. He points out that *N. J. S. A.* 32:23–105(3)(b), which lists offenses which bar a person from registration as a checker, does not mention gambling, and therefore conviction of such an offense should not be a ground for denying him registration. However, *subsection* (3)(a) is stated in much broader terms: no person shall be included in the longshoremen's register as a checker unless the Commission is satisfied that he possesses good character and integrity.

The gambling operation for which Kaiser was convicted was of great magnitude. Despite the fact that the case was fully tried to a jury, that the jury found him guilty on all counts, and that the resultant judgments of conviction were upheld on appeal, Kaiser persisted at the Commission hearing in saying that the gambling paraphernalia and money found in the North Arlington premises at a time when he was present were the property of his mother's boarder, "John

White," who disappeared before the raid and was never apprehended. This fact, and Kaiser's claimed lack of connection with the premises, were matters considered by the very jury which found him guilty. As for the mysterious "John White," the return made by the state troopers who executed the search warrant indicated the presence of bottles of medicine prescribed for the use of Moriarity, presumably the notorious "newsboy" who figured so prominently in news accounts a few years ago. This was not an operation carried on by the "boarder" in the confines of his closed bedroom, for when the police entered Mrs. Kaiser's home they found that the gambling operation was being carried on in the kitchen, so that neither she nor Kaiser could have been unmindful thereof.

██ Kaiser also contends that the "good recommendation" given him by his parole officer shows that he has paid his debt to society, and that he is now a truthful, honest and law-abiding person. The parole officer's recommendation was fully considered by the hearing officer and by the Commission, as were his family status and his prior and current employment. Nonetheless, the Commission did not have sufficient faith in Kaiser's being a completely rehabilitated person and having the good character and integrity which it demands of those who work along the waterfront. We cannot say that its conclusion was wrong, particularly in light of the fact that despite our finding that the trial record disclosed ample justification for the jury's verdict, *State v. Kaiser,* above, 74 *N. J. Super.,* at *page* 274, Kaiser still persisted in attributing the gambling enterprise uncovered by the State Police to boarder White and in protesting that he had no connection with that activity. The Waterfront Commission evidently concluded that the truth was not yet in him.

We have already touched upon the second ground raised on this appeal, namely, the claim that the Commission's findings were erroneously based upon Kaiser having been convicted of unrelated gambling misdemeanors in 1961, 1962 and 1963. Everyone concerned in the determination of Kaiser's applica-

tion — his attorney, the hearer, and the Commission — recog-nized that all four offenses with which Kaiser was charged and convicted stemmed from the single raid.

The Commission order is affirmed.