**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2255-21

WATERFRONT COMMISSION
OF NEW YORK HARBOR,

    Plaintiff-Respondent,

v.

FARID AMADO,

    Defendant-Appellant.

_____

           Submitted March 13, 2024 – Decided November 22, 2024

           Before Judges Vernoia and Gummer.

           On appeal from the Waterfront Commission of New York Harbor, RL-5395.

           Peter W. Till, attorney for appellant.

           Waterfront Commission of New York Harbor, attorneys for respondent (Phoebe S. Sorial, General Counsel, on the brief).

    The opinion of the court was delivered by

VERNOIA, J.A.D.

Farid Amado appeals from the Waterfront Commission of New York Harbor's final agency decision revoking his longshoreman registration. Amado contends: the evidence does not support the Commission's determination that his relationship with two known members of an organized crime group is inimical to the policies of the Waterfront Commission Act (the Act), N.J.S.A. 32:23-1 to -230; the administrative law judge (ALJ) made arbitrary, capricious, and unreasonable findings that the Commission erroneously adopted; and the Commission erred by relying on the concept of "willful blindness" to support its revocation of Amado's registration.[1] Unpersuaded by Amado's arguments, we affirm.

---

[1] The Act was repealed in part and amended in 2018, L. 2017, c. 324. Despite the changes to the Act under the 2018 repeal and amendments, the ALJ, the Commission, and the parties have relied on and cite to the applicable pre-amendment provisions of the Act. We do so as well. As the ALJ explained in his December 19, 2021 decision, the revisions to the Act under L. 2017, c. 324, were not effective until Governor Phil Murphy took certain actions specified in the revised Act. Those actions were not complete prior to the issuance of the Commission's final agency decision. See generally New York v. New Jersey, 598 U.S. 218, 220-23 (2023) (describing the adoption of L. 2017, c. 324, New Jersey's efforts to withdraw from the Commission, and the delays attendant to New Jersey's withdrawal from the Commission). We therefore apply the pre-2018 version of the Act in our disposition of the issues presented on appeal. The parties do not argue we should do otherwise.

A-2255-21

## I.

In 1953, New York and New Jersey created the Commission "to deal with sundry evils of the waterfront of the New York Harbor." Knoble v. Waterfront Comm'n of N.Y. Harbor, 67 N.J. 427, 430 (1975) (quoting State v. Murphy, 36 N.J. 172, 185 (1961)). "One of the principal purposes of the . . . Commission was to get rid of" "an unwholesome concentration of criminals on the waterfront." In re Application of Kaiser, 94 N.J. Super. 95, 99 (App. Div. 1967). Accordingly, at all times pertinent to this appeal, the Commission was tasked with enforcing the Act "to combat corruption and organized crime on the New Jersey and New York waterfronts." In re Pontoriero, 439 N.J. Super. 24, 29 (App. Div. 2015) (citing N.J.S.A. 32:23-2; Knoble, 67 N.J. at 430).

Amado began his career at the waterfront in 1991 as a checker[2] but left the position after four years. During a 1998 meeting at which Amado sought a longshoreman position, Albert Cernadas "walked in." Amado knew Cernadas because they lived "500 feet apart," and he also knew Cernadas's family. Amado

---

[2] "'Checker' shall mean a longshoreman who is employed to engage in direct and immediate checking of waterborne freight or of the custodial accounting therefor or in the recording or tabulation of the hours worked at piers or other waterfront terminals . . . ." Kaiser, 94 N.J. Super. at 98 (quoting N.J.S.A. 32:23-85(5)).

told Cernadas he was interested in a longshoreman position, Cernadas asked for Amado's information, and Amado obtained temporary registration as a longshoreman on December 23, 1998, and permanent registration on April 5, 2006.[3]

On February 20, 2020, the Commission's senior counsel interviewed Amado. Following the administration of an oath to Amado, counsel advised Amado the interview concerned "potential violations . . . of the" Act. Counsel also advised that if Adamo "commit[ted] fraud, deceit, or misrepresentation in connection with the interview [his] [longshoreman] registration may be revoked[.]" Counsel then questioned Amado extensively about issues pertaining to his employment as a registered longshoreman.

The following month, the Commission issued to Amado a notice of hearing that included nine counts of alleged misconduct and explained the purpose of the hearing was to consider "whether the Commission, in the exercise of its discretion, should revoke, cancel, or suspend [Amado's] registration as a

---

[3] A longshoreman "shall also include" in addition to the definition of a checker, "a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal" to perform labor, move waterborne freight, or other "services involving, or incidental to, the movement of freight at a waterfront terminal." N.J.S.A. 32:23-85(6).

longshoreman."  The notice stated the Commission would consider at the hearing whether Amado had associated with Cernadas and Manual Rodriguez, "under circumstances where such association create[d] a reasonable belief that [Amado's] participation in" the activities for which he was "required to be licensed or registered under" the Act "would be inimical to the policies of the Act.  The notice alleged Cernadas and Rodriguez were members of the Genovese organized-crime family, "career offenders," and had been convicted of "racketeering activity."

The notice further explained the Commission would consider at the hearing whether Amado had provided false testimony during his interview with the Commission's senior counsel by stating he had "no clue" why Rodriguez had gone to prison.  The notice also stated the Commission would consider whether Amado's prior disciplinary history during his employment as a longshoreman, combined with his ongoing associations with Cernadas and Rodriguez, rendered his "presence at the piers or other waterfront terminals in the Port of New York a danger to the public peace or safety" such that it would have "permitted [his] disqualification from inclusion in the" registry of longshoreman "upon original application."

5

An administrative law judge held a hearing at which the Commission introduced ninety-three exhibits in evidence and presented the testimony of a Commission licensing manager, who also served as an intelligence analyst. At the hearing, Amado called his wife, Sylvia Amado, as a witness, and he testified on his own behalf.

The evidence presented at the hearing established that in 2005 Cernadas pleaded guilty in the United States District Court for the District of New York to two counts of conspiracy to commit mail and wire fraud. The court sentenced Cernadas to a two-year probationary term.

In a related civil case brought by the United States against Cernadas and multiple codefendants, Cernadas agreed to entry of a consent judgment. The judgment ordered Cernadas, who had served as president of Local 1235 of the International Longshoremen's Association, AFL-CIO (ILA) at the New York Harbor, to forfeit and resign from any position he held with the ILA. The order further permanently enjoined him "from engaging in conduct which constitutes or furthers an act of racketeering activity," participating in the affairs of any labor organization or pension or welfare fund, and "knowingly associating, directly or indirectly, with any member or associate of any criminal group, including "'La Cosa Nostra.'"

A-2255-21

In 2014, Cernadas pleaded guilty in United States District Court for the District of New Jersey to one count of racketeering conspiracy. The indictment charging defendant with that crime alleged he was one of four individuals "employed by and associated with the Genovese crime family" who had conspired to violate a provision of the United States Code "through a pattern of racketeering activity." In January 2015, the court entered a judgment of conviction against Cernadas, sentencing him to a three-year probationary term.

Rodriguez was convicted in 1992 of second-degree aggravated assault and fourth-degree promoting gambling. The court sentenced Rodriguez to an aggregate nine-year term of imprisonment.

A 1998 indictment filed in the United States District Court for the District of New Jersey identified Rodriguez as an individual "employed by and associated with an enterprise, that is, the Queli Faction of the Genovese [c]rime [f]amily." Rodriguez later pleaded guilty to a count in the indictment charging he and other alleged members of the crime family had conspired "to participate in the use of extortionate means," including "express and implicit threats of violence, to collect and attempt to collect from various individuals extensions of credit." The court sentenced Rodriguez to a twenty-eight-month term of imprisonment.

A-2255-21

In 2016, a New Jersey State Grand Jury indicted Rodriguez and nine others, charging they had engaged in racketeering and other offenses. Rodriguez later pleaded guilty to second-degree money laundering and transportation and possession of property known to be derived from criminal activity. Three years later, on October 17, 2019, the court sentenced Rodriguez to a four-year prison term.

The Commission also presented evidence establishing that over many years Cernadas and Rodriguez had been identified as members of the Genovese organized crime family. The Commission introduced the transcript of its senior counsel's interview of Adamo, during which Adamo had admitted knowing and having contact and communications with Cernadas and Rodriguez. More particularly, Adamo admitted having known Rodriguez since they were children because they had grown up in the same neighborhood. When asked to describe his relationship with Rodriguez, Adamo stated Rodriguez was a "friend."

Adamo further testified Rodriguez had attended a 2019 funeral mass following the death of Adamo's brother and that he was aware Rodriguez had been sentenced to prison in 2019. He also described Rodriguez as a "bubble-gum mobster" and admitted he had sent Rodriguez a Facebook message in 2019 offering to help Rodriguez's family while Rodriguez served his prison sentence.

Adamo recalled he had received a Facebook message from Rodriguez three years earlier stating that Adamo should have contacted him while looking for a house in Florida because Rodriguez's parents had moved there.

The Commission also presented numerous Facebook messages Adamo had sent to Rodriguez over the years, with many of them sent in 2019 before Rodriguez's prison sentence began. Adamo admitted sending the messages, which included holiday greetings, congratulations concerning Rodriguez's son, compliments on pictures Rodriguez had posted, and blessings to Rodriguez and his family.

During his interview, Adamo acknowledged Rodriguez had gone to prison, but when asked for what Rodriguez had gone to prison, Adamo stated he had "no clue" and did not know. He also denied following up to determine the reason Adamo had gone to prison, explaining that "they" were going to give Rodriguez a "going-away" party before he went to prison, but he did not go to the party and had not been invited. Other evidence presented during the hearing, including Adamo's testimony, his statements during the interview, and Facebook messages reflect that he had understood the Commission's senior counsel's question about his knowledge of the reason Rodriguez went to prison pertained to Rodriguez's prison sentence that began in 2019.

A-2255-21

Adamo's interview with the Commission's senior counsel also included Adamo's admissions about his contacts and communications with Cernadas. Adamo admitted Cernadas had assisted him in obtaining his longshoreman's registration 1998 because he had lived near Cernadas and had grown up with Cernadas's daughters.

Adamo was also aware of Cernadas's criminal background. He acknowledged that in 2005 had signed and sent a letter to the United States District Court for the Eastern District of New York concerning Cernadas's then-impending sentencing. The letter described Cernadas as an "honest and straightforward person" who was "always willing to give . . . good advice" and is available "to listen if you have any problems." Adamo expressed gratitude to Cernadas for all he had done for Adamo and his family and stated he and his family "would be very grateful if [the court] would be lenient in sentencing" Cernadas.

Adamo also had requested that Cernadas become a friend on Facebook, and Cernadas accepted. In a November 2014 Facebook post, Cernadas displayed a photo of a damaged car, and Adamo responded with a message, "Hope you are ok." Three weeks later, Cernadas pleaded guilty to the racketeering-conspiracy charge in the United States District Court for the District of New Jersey.

10

In 2015, after learning Cernadas had been ill, Amado traveled to Cernadas's home "to make sure he was all right, feeling good and everything." At that time, Cernadas was serving the probationary sentence the United States District Court had imposed for his racketeering-conspiracy conviction.

Adamo's Facebook friendship with Cernadas continued at least through his February 2020 interview with the Commission's senior counsel. Also, a few days before the interview, Adamo saw Cernadas at a barbeque and "ran up to him," "hugged him," "kissed him," "picked him up," "put him in the middle of the dance floor," and told Cernadas that he wished they "still had [Cernadas] down the port."[4]

The Commission also presented evidence establishing that Adamo had a disciplinary history during his employment as a longshoreman. The evidence showed that: in 2009 and 2010 Adamo had been barred from employment as a longshoreman with Maher Terminals, LLC, for being verbally abusive to a supervisor; in 2011, Maher Terminals, LLC, permanently barred Adamo from employment based on Adamo's reckless operation of a vehicle while spewing obscenities to its longshoremen passengers, some of whom had reported

_____

[4] Adamo also explained that his nephew is married to Cernadas's daughter and the barbeque had been held to celebrate his nephew's birthday.

personal injuries resulting from the incident; in September 2011, the New York Shipping Association imposed a six-month ban on Adamo's employment as a longshoreman by any employer; and in August 2015, APM Terminals had imposed a forty-five day ban on Adamos's employment with it as a longshoreman as the result of his involvement in a verbal altercation with a supervisor.

Following the submission of written summations, the ALJ issued a detailed written opinion summarizing the charges against Amado, and noting the charges fell in three areas: Adamo's association with persons identified by law enforcement as associates or members of an organized crime group, career offenders, or a persons who had been convicted of racketeering; engaging in fraud, deceit, or misrepresentation during his sworn interview with the Commission's senior counsel; and Adamo's prior disciplinary history and associations with Cernadas and Rodriguez had rendered Adamo's presence at the piers or other waterfront terminals a danger to the public peace or safety such that he would have been disqualified for a longshoreman's registration upon original application.

The ALJ found our decision in In re Pontoriero established the standard for determining a Commission's claim a longshoreman's registration should be

12

revoked or suspended under N.J.S.A. 32:23-93(6), for an association with a person identified by law enforcement "as a member or associate of an organized crime group," or under N.J.S.A. 32:23-93(7), for a "knowing association with a person who has been convicted of racketeering activity." 439 N.J. Super. 24 (App. Div. 2015). The ALJ noted that under the principles established in Pontoriero, the Commission was not required to prove Adamo had actual or constructive notice that Cernadas or Rodiquez fell within the categories of individuals with whom he was not permitted to associate as a registered longshoreman. See Pontoriero, 439 N.J. Super. at 39-40. Instead, the ALJ explained the Commission could satisfy the "knowledge" requirements under N.J.S.A. 32:23-93(6) and (7), by excluding that Adamo's association with Cernadas and Rodriguez was by "happenstance, inadvertent, or unplanned encounters." Id. at 40.

The ALJ further explained that for the Commission to establish Adamo engaged in fraud, deceit, or misrepresentation during his interview with its senior counsel, the Commission must prove Adamo made a false statement of fact intentionally, knowingly, or recklessly, or made a knowing misrepresentation or knowing concealment of a fact to induce another to act to

their detriment. The ALJ also noted the Commission was required to prove the charges by a preponderance of the evidence.

The ALJ determined the Commission's witness had an impressive background as an intelligence analyst and had testified as a "quality, forthright witness." The ALJ rejected Sylvia Adamo's testimony her husband was a person of truthful character, finding she had a "clear bias and . . . obvious motive in trying to save her husband's lucrative job."

The ALJ further determined Adamo was not a credible witness. The ALJ found Adamo had "willfully testified falsely" at his interview with the Commission's senior counsel and during his testimony at the hearing. The ALJ cited Adamo's hearing testimony and concluded he had "falsely denied knowledge of incriminating information" concerning prior criminal charges against Cernadas and had been evasive responding to questions about them. The ALJ also found Adamo had testified inconsistently about his interactions with Cernadas at the barbeque, noting that during the interview Adamo testified he had hugged and kissed Cernadas at the barbeque but then denied he had done so at the hearing.

The ALJ detailed Adamo's in-person contacts and Facebook communications with Cernadas and Rodriguez over the years and determined

Adamo had associated with both "as a friend, companion, or ally." The ALJ also found Adamo held a significant position as a longshoreman as evidenced by his job responsibilities—noting he moved cargo that is x-rayed by United States Customs—and his substantial salary of more than $250,000 per year. The ALJ further found Adamo's interactions with Cernadas and Rodriguez had continued on Facebook "as late as February 2020," when he was interviewed; Adamo had interacted with Rodriguez over Facebook and offered to help Rodriguez's family in 2019 just prior to Rodriguez's incarceration for racketeering-conspiracy; and Adamo had interacted with Cernadas at the barbeque in 2020, telling Cernadas he wished Cernadas "was still on the port."

The ALJ further explained that Adamo's long associations with Cernadas and Rodriguez "weighed highly in favor" of finding the associations were inimical to the policies of the Act. The ALJ determined "the timing, frequency, and quality of the associations, when juxtaposed with the ups and downs of" Adamo's career supported an "impression" that the associations had influenced his career on the waterfront. The ALJ agreed with the Commission that when Adamo became Facebook friends with two organized crime figures and publicly posted messages of support for them, he "essentially boasted of his relationship[s]" with the intent of making the relationships known to the public.

15

The ALJ further found Adamo's relationships with Cernadas and Rodriguez were direct and not attenuated through third-parties and that Cernadas's and Rodriguez's "notoriety as Genovese [c]rime [f]amily members is undeniable." The ALJ reasoned that Adamo's long-term and public associations with two members of an organized crime family that has historically controlled the New Jersey waterfront further weighed in favor of a finding the associations were inimical to the policies underlying the Act.

The ALJ agreed with the Commission that Adamo's employment record as a longshoreman "has been marred by a history of workplace disciplinary violations and an abiding relationship with organized crime associates." The Commission noted the public nature of the associations "creates a perception of corruption" that is inimical to the Act.

The ALJ also determined the Commission had proven Adamo committed fraud, deceit, or misrepresentation during his interview by the Commission's senior counsel. The ALJ found Adamo had testified falsely during the interview when he said he had "no clue" why Rodriguez going to prison. The ALJ reasoned that Rodriguez's notoriety, Adamo's interest in Rodriguez's personal life as expressed in their Facebook exchanges, and "all of the other evidence"

16

rendered incredible and false his statement he had "no clue" why Rodriguez was going to prison.

The ALJ further concluded that Adamo's undisputed disciplinary history as a longshoreman, when coupled with his associations with Cernadas and Rodriguez, established that Adamo presents a current danger to the public peace and safety at the waterfront.

The ALJ also determined revocation of Adamo's longshoreman registration was the appropriate sanction for his violations. The ALJ agreed with the Commission that Adamo's actions and associations undermined the Commission's efforts to ensure public safety by reducing corruption and that a reprimand or suspension would not adequately address the "lingering risk or perception of corruption caused by" Adamo's association with two members of the Genovese crime family.

The Commission conducted a hearing on the ALJ's decision and recommended revocation sanction at which Adamo appeared with his counsel. Following oral argument and a statement by Adamo, the Commission voted to revoke Adamo's longshoreman registration.

In a January 18, 2022 written decision, the Commission made findings of fact supporting its determination Adamo had associated with Cernadas and

Rodriguez, who the Commission determined are members or associates of an organized crime group, are career offenders, and have been convicted of racketeering activity. The Commission further found Adamo had engaged in fraud, deceit, and misrepresentation during his interview by falsely testifying he had "no clue" why Rodriguez had been sentenced to prison in 2019. The Commission also determined Adamo's disciplinary history and associations with Cernadas and Rodriguez rendered his presence at the waterfront a danger to the public peace or safety that would have disqualified his registration as a longshoreman upon original application.

Based on those findings, the Commission ordered the immediate revocation of Adamo's registration. This appealed followed.

Adamo raises the following arguments for our consideration:

> I. THE WATERFRONT COMMISSION'S FAILURE TO ESTABLISH THAT THE ALLEGED ACTIVITY OF [AMADO] WAS INIMICAL TO THE POLICIES OF THE WATERFRONT COMMISSION ACT CONSTITUTES REVERSIBLE ERROR.
>
> II. THE DETERMINATIONS BY THE ADMINISTRATIVE JUDGE OFFICER WERE ARBITRARY, CAPRICIOUS, AND UNREASONABLE, THEREBY WARRANTING A REVERSAL OF THE WATERFRONT COMMISSION'S DETERMINATION.

18

III. FUNDAMENTAL FAIRNESS PRECLUDES AN ADMINISTRATIVE AGENCY SUCH AS THE WATERFRONT COMMISSION TO DEPRIVE ITS EMPLOYEES OF THEIR LIVELIHOODS BASED UPON THE CONCEPT OF WILLFUL BLINDNESS.

II.

Our standard review of an agency decision is limited. Matter of Ambroise, 258 N.J. 180, 197 (2024). We reverse an agency decision only if we find the decision is "arbitrary, capricious, or unreasonable or . . . not supported by substantial credible evidence in the record as a whole." Ibid. (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). An agency's decision is arbitrary, capricious, or unreasonable if: it "violates express or implied legislative policies, that is, did the agency follow the law"; the record does not "contain substantial evidence to support the findings on which the agency based its action"; or "in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." Id. at 197-98 (quoting In re Carter, 191 N.J. 474, 482 (2007)).

Our "deferential standard" of review also applies to the consideration "of disciplinary sanctions." Id. at 198 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)). We will not substitute our judgment for the agency's even where "we

may have reached a different result." Ibid. We therefore will not reverse a disciplinary sanction unless "the 'punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Ibid. (quoting Stallworth, 208 N.J. at 195).

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006). "[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Rev., 200 N.J. Super. 74, 79 (App. Div. 1985)).

In relevant part, N.J.S.A. 32:23-93(6) and (7) provide that a longshoreman's license or registration may be revoked or suspended for association with an individual who is part of an organized crime group, or has been convicted of a racketeering activity, if that association would create a reasonable belief the association is inimical to the policies of the Act. N.J.S.A. 32:23-93(6) and (7). "Association" under the Act "encompasses the ordinary meaning of the term: to keep company, as a friend, companion or ally—and

encompasses both social and economic relationships."  Pontoriero, 439 N.J. Super. at 38.

An association is inimical to the policies of the Act when it is "adverse to the public confidence and trust in the credibility, integrity and stability of the waterfront and in the strict regulatory process of the Act."  Id. at 38-39.  "The alleged association need only 'create a reasonable belief' that the [longshoreman's] continued participation is inimical to the . . . Act, and the [longshoreman's] participation is inimical if it is adverse to public confidence and trust."  Id. at 40 (quoting N.J.S.A. 32:23-93(6) and (7)).  The Commission establishes an inimical association under N.J.S.A. 32:23-93(6) or (7) by proving that "a reasonably objective observer could believe that the criminal associate could influence the licensee in his or her role as a worker regulated by the Act."  Id. at 42.

In Pontoriero, we adopted a set of eleven non-dispositive factors that are relevant to a determination as to whether an association is inimical to the Act. Id. at 42.  The factors include:

> (1) The nature and sensitivity of the licensee's position;
>
> (2) The time elapsed since the licensee's last interaction with the associate;
>
> (3) The duration and frequency of the association;

(4) The purpose and nature of the association;

(5) Whether the association was attenuated through third-parties;

(6) The associate's character and reputation;

(7) The licensee's knowledge or reasonable efforts to determine the associate's character and reputation;

(8) If there is more than one associate, the number of associates, and the relationship amongst them;

(9) Termination of the association, if any;

(10) The reasons for any such termination; and

(11) Any other relevant facts or circumstances.

[Ibid.]

Here, the ALJ considered the Pontoriero factors, made detailed findings of fact as to each, and concluded they weighed in favor of a finding that Adamo's associations with Cernadas and Rodriguez are inimical to the policies of the Act. The Commission adopted the ALJ's findings and similarly concluded Adamo's associations with two well-known members of the Genovese crime family were inimical to the Act. The ALJ's findings are amply supported by sufficient credible evidence. We therefore defer to them. Ambroise, 258 N.J. at 197; see also McClain v. Bd. of Rev., Dep't of Lab., 237 N.J. 445, 456 (2019) (explaining

in an appeal from an agency decision, the reviewing court "defer[s] to factfindings that are supported by sufficient credible evidence in the record").

Adamo argues the evidence supports a different and more favorable weighing of the factors that requires a conclusion his associations with Cernadas and Rodriguez are not inimical to the policies of the Act. He argues his associations are different than those we found in Pontoriero were inimical to the Act. He contends that his Facebook communications and other interactions with Cernadas and Rodriguez were innocent and the product of familial and personal relationships that "were merely the byproduct of the random history of residence" in the same neighborhood "community where [they] had all come to know . . . each other."

He also claims the associations were not nefarious but were innocent and unrelated to his employment. He further argues the Commission's determination he was not a credible witness and had lied during his interview with the Commission's senior counsel is not supported by the evidence. He contends the contradictions in his statements and testimony upon which the ALJ had relied in support of its credibility determination are explained by his lack of education, his failure to understand the questions posed, and other evidence.

We reject Adamo's contentions because they are based on the premise that we should interpret the evidence in a manner different than the Commission. We are not permitted to do so. See Carter, 191 N.J. at 483 (explaining we may not substitute our judgment for an agency's even if we would have decided a case differently). We decide only whether the Commission's findings of fact are supported by "sufficient credible evidence in the record as a whole." Stallworth, 208 N.J. at 194. And, based on our review of the record, it is indisputable that although Adamo contends the evidence should be interpreted differently, the ALJ and Commission's findings are fully supported by sufficient credible evidence.[5]

---

[5] Adamo also argues the ALJ erred by relying on the concept of willful blindness as a basis for the determinations Adamo was not a credible witness and his interview-statement he had "no clue" why Rodriguez was prison was false. See generally Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769-70 (2011) (explaining the concept of willful blindness). The argument is not supported by the record. Although he made reference to the concept of willful blindness in his decision, the ALJ explained his determinations Adamo was not a credible witness and had provided a false statement during his interview "were made without the necessity of reliance upon" the willful blindness "doctrine." We are similarly unpersuaded by Adamo's claim he is entitled to reversal because the ALJ relied in part on newspaper articles documenting Cernadas's and Rodriguez's involvement with the Genovese crime family. Most simply stated, other evidence, including the testimony of the Commission's witness and the numerous court records and decisions admitted in evidence, clearly established Cernadas's and Rodriguez's involvement with the organized crime group as well as their convictions for racketeering activity that supported the

Adamo also fails to demonstrate the Commission's decision "violates express or implied legislative policies" of the Act or that the Commission "clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." Ambroise, at 197-98 (quoting Carter, 191 N.J. at 482). That is, Adamo makes no showing the Commission's decision is arbitrary, capricious, or unreasonable. See ibid.

The ALJ reviewed, applied, and made detailed findings concerning the Pontoriero factors and the evidence the ALJ and Commission determined to be credible supported their determinations Adamo had longstanding, public, associations with two individuals who were known members or associates of an organized crime group and who otherwise had convictions for racketeering activity and that those associations were inimical to the policies under the Act. Those well-supported findings do not permit a conclusion the Commission's decision was arbitrary, capricious, or unreasonable. See Carter, 191 N.J. at 483 (explaining a reviewing court generally "defer[s] to an agency's expertise and knowledge of a particularly field" (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992))).

---

Commission's determination Adamo's associations with them violated N.J.S.A. 32:23-93(6) and (7).

For the same reasons, we discern no basis to reverse the Commission's determinations Adamo falsely stated during his February 2020 interview that he had no clue why Rodriguez was going to prison or that his associations Cernadas and Rodriguez, when coupled with his prior disciplinary history during his employment as longshoreman, rendered his presence at the waterfront a danger to the public peace or safety such that he would have been disqualified from inclusion in the longshoremen's registry upon original application. Again, the Commission's findings of fact supporting those determinations are supported by sufficient credible evidence, we defer to the ALJ's "adverse credibility determination[s]" because "we obliged to 'give due regard to the opportunity of the one who heard the witness to judge their credibility,'" Burlington Cnty. Bd. of Soc. Servs. v. G.W., 425 N.J. Super. 42, 47 (App. Div. 2012) (internal citations omitted), and Adamo has not otherwise sustained his burden of establishing the Commission's determination is arbitrary, capricious, or unreasonable, Arenas, 385 N.J. Super. at 443-44.

Adamo also argues the Commission erred by imposing revocation of his longshoreman's registration as the sanction. Although he maintains the Commission erred in finding the violations in the first instance, he contends that

26

even accepting its findings, the Commission should have imposed only a suspension of his registration.

A reviewing court shall not disturb a sanction imposed by an agency unless "such punishment is 'so disproportionate to the offense . . . as to be shocking to one's sense of fairness.'" Carter, 191 N.J. at 484-85 (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)). Given the policies underlying the Act, Adamo's long-term association with two individuals who are members of an organized crime family with a history of criminal involvement at the waterfront, and who have also been convicted of racketeering activity, we discern no basis to reverse the sanction imposed by the Commission. Most simply stated, the Commission's revocation of Adamo's longshoreman's registration does not shock our sense of fairness given all the attendant circumstances established by the evidence and as found by the ALJ and the Commission. See generally Pontoriero, 439 N.J. Super. 29-30 (affirming revocation of a license issued under the Act to a hiring agent based on his associations with two members of the Genovese crime family because the associations "demonstrate a lack of good character and integrity, and allowing him to continue working . . . would undermine public confidence in the integrity and stability of the operation of the waterfront").

To the extent we have not expressly addressed any other arguments made on Adamo's behalf, we have considered them and find they are without sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION